THIRD DIVISION
 Filed: 09/18/02

1-00-1311

THE PEOPLE OF THE STATE OF ILLINOIS ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County
 )
 v. )
 )
ANTOINE OLLIE, ) Honorable
 ) Dennis Dernbach,
 Defendant-Appellant, ) Judge Presiding.

 JUSTICE HOFFMAN delivered the opinion of the court[1]:
 Following a jury trial, the defendant, Antoine Ollie, was convicted of first degree murder and
home invasion. The trial court sentenced the defendant to 50 years' imprisonment for first degree
murder and a concurrent term of 15 years' imprisonment for home invasion. The defendant filed the
instant appeal asserting that: 1) the trial court erred in denying his motion to quash his arrest
and suppress his statement; 2) he was denied his right to a trial before a fair and impartial jury
because the trial court failed to sua sponte dismiss one of the jurors for cause; 3) the State
improperly introduced hearsay testimony implicating him in the commission of the crimes charged; 4)
the State elicited prejudical and inflammatory testimony about the decedent and his family for the
sole purpose of appealing to the jury's sympathy and to create a sense of outrage; 5) his first
degree murder conviction was the product of a double enhancement and constitutes double jeopardy; 6)
his 50-year sentence for first degree murder is excessive; and 7) the mittimus should be amended to
reflect the proper credit for time served prior to sentencing.[2]
 The defendant and three co-defendants, Anthony Porter, Martin Johnson, and Theodore Glaspie,
were charged with first degree murder and home invasion in connection with the shooting of Kenyatta
Wilkins, which took place on October 15, 1997. Prior to trial, the defendant filed a single motion
seeking to quash his arrest, alleging that it was made without probable cause, and to suppress
evidence, including his inculpatory statement. The defendant also filed a separate motion seeking
to suppress his inculpatory statement on the basis that he was not advised of his rights before
making it.
 The trial court first conducted a hearing at which it heard the defendant's motion to quash
his arrest simultaneously with similar motions filed by Porter and Johnson. The evidence as it
pertained to the defendant is as follows. The defendant called Chicago police officer Patrick
Keating to testify. According to Keating, when he began his shift on October 15, 1997, he learned
that Chicago police detectives Lenihan and Ryan wished to speak with a person known as "Red" in
connection with a murder investigation they were conducting. Having previously had contact with a
man named Willie Lewis, also known as "Red", Keating checked police files to find Lewis' address,
which was listed 7244 South Artesian Avenue. Around 11 or 11:30 p.m on October 15, 1997, Keating
and Chicago police officers Glynn, Clisham, and Jesionowski went to that address. The officers did
not have an arrest warrant for Lewis or a search warrant for the premises. When the officers rang
the doorbell, Lewis' mother answered the door. According to Keating, he identified himself as a
police officer and stated that he wished to speak to Lewis in connection with an investigation.
Keating testified that Lewis' mother allowed him into the house and told him that Lewis was
upstairs. Keating and Glynn then went upstairs.
 Carolyn Farrar, Lewis' mother, offered a far different version of events. According to
Farrar, when she answered her door, she told the officers that Lewis was not there. Farrar
testified that she agreed to speak to the officers but stated that she wanted to get a housecoat
before letting them in the house. When she walked away from the door, though, the officers "just
stormed into" the house, following her to the back of the house and then going into the basement and
upstairs. Farrar testified that, after retrieving her housecoat, she went into the basement, where
she found that four police officers had Lewis' three friends, including the defendant, handcuffed
and kneeling on the floor. Farrar estimated that there were 15 to 20 police officers at her house.
Some of the officers had helmets, shields, and battering rams.
 The State called Officer Jesionowski to testify. Jesionowski confirmed Keating's testimony
that Farrar allowed the officers into the house. He testified that none of the officers had
helmets, shields, or a battering ram. According to Jesionowski, while Keating and Glynn were
upstairs, he heard some people moving around in the basement. He and Officer Clisham went
downstairs to investigate. The officers found the defendant, Porter, and Johnson in the basement
and asked the men "if they knew what was going on over on Damen." According to Jesionowski, the men
immediately stated that Lewis was not involved in the shooting. Jesionowski asked the three men
whether they would be willing to accompany the officers to the police station to speak with
detectives, and the men agreed. Jesionowski testified that the officers did not put the men in
handcuffs at any time or place them on their knees. He further testified that, upon discovering the
three men in the basement, the officers called for another unit to assist them, but there were never
more than six officers present at the Lewis home. Jesionowski testified that he did pat down the
three men to make sure that they were not armed. According Jesionowski, Keating and Glynn
transported Lewis to the police station, while he and Clisham transported the defendant, Porter, and
Johnson. When they arrived at the police station, Jesionowski and Clisham placed the defendant,
Porter, and Johnson in an interview room together and closed the door, turning the case over to
detectives. Jesionowski did not know if the door to the room was locked.
 Detective Robert Lenihan testified that he and his partner, Detective Bernard Ryan, were
assigned to investigate Wilkins' murder. The detectives had received information that a person
known as Red and his friends had exchanged gunfire with the victim and his friends the day prior to
the murder. When he began his shift at 8:30 a.m. on October 16, 1997, he learned that Lewis, the
defendant, Porter, and Johnson were at the station waiting to be interviewed. Lenihan testified
that the defendant, Porter, and Johnson were not handcuffed, that they were all in the same room,
and that the room was not locked. Lenihan introduced himself to the men and stated that he wished
to speak with them but that there were other things he needed to do first. He asked the men to be
patient. According to Lenihan, the men asked "how long it would take" and, when he said he would be
as quick as possible, they did not object.
 Lenihan testified that he and his partner returned to the station around 3 or 3:30 p.m. and
brought the men food. Lenihan then spoke to Porter, the defendant, Lewis, and Johnson,
individually, in that order. It was between 3 and 5 p.m. when he spoke to the defendant. Lenihan
advised the defendant of his Miranda rights before speaking to him. The defendant stated that he
did not know anything about the murder. After speaking to the defendant, Lenihan returned him to
the room with Porter and Johnson. When asked why he read the defendant his rights prior to
interviewing him, Lenihan responded that the defendant was involved in the incident the day prior to
the victim's murder and that he did not know what the defendant was going to say about either that
incident or the murder. Upon further questioning, though, Lenihan acknowledged that, at the time he
first interviewed the defendant, he had no information that the defendant was involved in the
incident the day prior to the murder.
 According to Lenihan, when he spoke to Johnson, Johnson stated that, on October 14, 1997, he
and his friends were involved in two altercations with the victim and his friends. After this
conversation with Johnson, Lenihan and Ryan went Johnson's residence, where they left their card
with Johnson's father, along with a request that Johnson's mother contact them. Lenihan testified
that the detectives wished to speak with Johnson's mother because they had been told that she had
information relevant to their investigation. Upon leaving the Johnson home, the detectives returned
to the police station. According to Lenihan, he then confronted Johnson with some unspecified
information, and Johnson gave an oral statement naming himself, Lewis, Porter, the defendant, and
two other people as participants in the victim's murder. Lenihan testified that, before Johnson
gave the statement, he had checked Johnson's background and discovered that there was an outstanding
juvenile warrant for Johnson's arrest. According to the detective, Johnson was "in custody at that
time when we found out that he had a juvenile warrant."
 Lenihan testified that, based upon Johnson's statement, the defendant and Porter were
separated and "put in locked rooms, they were taken into custody."
 The defendant's girlfriend, Jammie Miller, testified in rebuttal. Miller was upstairs in bed
with Lewis when the police arrived. She testified there were "a lot" of officers in the house and
that the officers were "rambling" through the house, searching it. When Miller later went down to
the first floor, she saw the officers take the defendant, Porter, and Johnson out of the house in
handcuffs. She did not see any officers with helmets, shields, or a battering ram.
 In surrebuttal, Officer Glynn testified that the defendant, Porter, and Johnson were not
handcuffed, that the officers never searched the house, and that there were never more than six
officers on the scene.
 In ruling on the defendant's motion, the trial court specifically found that Farrar's
testimony about the officers' conduct was not credible and that it was "more reasonable" that the
events occurred as stated by the officers. He found that the defendant was not handcuffed and
voluntarily accompanied the officers to the police station. The court also found that the facts
that the defendant was placed in a room with Johnson and Porter, rather than by himself, and that
the officers did not prepare an arrest report supported a finding that the defendant was not under
arrest when he arrived at the police station. The trial court found that there was no evidence that
the defendant asked to leave from the time that he arrived at the station to the time that Detective
Lenihan arrived and spoke briefly to him, asking him to wait and be patient. The court stated that:
"At some point their status changed and that is unclear at this point from my reading of it in terms
of the statements they made. *** I'm dealing only with the initial taking into custody and going to
the station up until Lenihan deals with them. They went voluntarily and remained voluntarily for a
period of time." The trial court denied the motion to quash arrest, finding that the defendant was
voluntarily at the station at least until the time that Detective Lenihan spoke to him at 8:30 a.m.
on October 16. The court, however, made no finding as to when the defendant was placed under
arrest.
 On a subsequent date, the trial court conducted a hearing at which it simultaneously heard the
motions to suppress statements filed by the defendant and Porter. Detective Ryan was the only
witness to testify at the hearing. Ryan testified that, around 3 p.m. on October 16, 1997, he and
Detective Lenihan interviewed Porter for 10 to 20 minutes. Thereafter, the detectives interviewed
the defendant. Lenihan advised the defendant of his rights pursuant to Miranda. The defendant
stated that he understood each of the rights and that he wished to speak with the detectives. Ryan
testified that the detectives then had a 10 to 20 minute conversation with the defendant during
which they asked him general questions. The defendant did not implicate himself in the victim's
murder during that conversation. At the end of the conversation, the defendant was returned to the
room with Porter and Johnson. Asked if he ever told the defendant that he was free to leave, Ryan
answered that he "never used those express words" but that the defendant was told several times
during the day that he was there to assist Lewis and that he was not under arrest. Ryan testified
that the police usually keep cooperative witnesses together, but do not keep suspects together.
 Ryan testified that he and Lenihan had a second conversation with the defendant around 7 p.m.
on October 16. Lenihan again advised the defendant of his Miranda rights, and the defendant again
stated that he understood them. According to Ryan, this conversation lasted 15 to 25 minutes.
After this conversation, Ryan testified, he had no further contact with the defendant in connection
with the murder investigation. Prior to this second interview with the defendant, Johnson had
already given a statement implicating the defendant in Wilkins' murder.
 According to Ryan, he advises a "fair amount" of the witnesses that he interviews of their
Miranda rights because some people who come in as witnesses later turn out to be co-offenders. In
the defendant's case, he was a "close associate" of Lewis, who was a suspect. Ryan testified that
he believed that the room where the defendant, Porter, and Johnson were being kept was locked. He
testified that even witnesses are not allowed to walk around the police station unaccompanied, that
the men were told to knock on the door if they needed anything, that they were told they were
witnesses and were not under arrest, and that they would have been allowed to leave if they had
asked to do so.
 The parties stipulated that, at 12:50 a.m. on October 18, the defendant gave a handwritten
statement regarding the shooting of the victim to Assistant State's Attorney Steve Klaczynski and
Chicago police detective Nowakowski.
 In ruling on the defendant's motion to suppress his statement, the trial court repeated its
earlier finding that the defendant was not under arrest when he was transported to the station. The
court again found the officers' testimony to be credible and noted the officers' testimony that the
defendant was free to leave the station and would have been allowed to do so had he asked. The
court stated that "there's a difference between being free to leave a police station and [being]
free to roam the police station." The court further found that, based on the evidence presented at
the hearing, it was "obvious" that the defendant was in custody "by 7:00 on the 17th", after Johnson
made his statement implicating the defendant. The trial court denied the defendant's motion to
suppress his statement.
 The trials of the defendant and his three co-defendants were severed. The court conducted
simultaneous but separate jury trials for the defendant and Porter. At the defendant's trial, the
State introduced evidence that the victim's body was found in a second floor apartment located at
2039 West 53rd Street on the morning of October 15, 1997, and that the victim died as a result of
multiple gunshot wounds. The only evidence which the State introduced connecting the defendant with
the victim's murder was the defendant's own statement. Assistant State's Attorney Klaczynski
testified that he first interviewed the defendant around 11:45 p.m. on October 17, 1997, at which
time the defendant made an oral statement. At 12:50 a.m. on October 18, 1997, Klaczynski took a
handwritten statement from the defendant, memorializing the earlier oral statement. He advised the
defendant of his Miranda rights prior to each statement. Klaczynski read the handwritten statement
into evidence. According to the defendant's statement, on the morning of October 15, 1997, the
defendant and five other men devised a plan to kill "Yatti" (the victim). The plan provided that
the defendant and two others were to act as "lookouts" while the remaining three men went inside and
killed the victim. The defendant stated that the six men went in two cars to 2039 West 53rd Street.
 The defendant and two other men stayed outside while the remaining three men went inside. Shortly
thereafter, the defendant heard several shots and then saw the three men run out of the building and
get into one of the cars. All of the men then drove away. The defendant drove one of the two cars.
 The defendant rested without calling any witnesses. The jury was instructed regarding the
offenses of home invasion, intentional murder, knowing murder, and felony murder. It was also
instructed regarding the theory of accountability. Following deliberation, the jury returned a
guilty verdict as to the offense of home invasion and a general verdict of guilty as to the offense
of first degree murder. At sentencing, the trial court stated that it was most appropriate to enter
judgment on the felony murder count and ordered that the counts alleging knowing and intentional
murder would merge with the felony murder count. The trial court then sentenced the defendant to
concurrent prison terms of 50 years for first degree murder and 15 years for home invasion. The
defendant has appealed.
 On appeal, the defendant first argues that the trial court erred in denying his motion to
quash his arrest and suppress his inculpatory statement. Here, the defendant filed a motion seeking
to quash his arrest, alleging that it was made without probable cause, and to suppress any evidence,
including his inculpatory statement. He also filed a separate motion to suppress his statement on
the basis that he was not advised of his rights prior to giving the statement. On appeal, the
defendant contends only that the trial court erred in failing to suppress the statement as the
product of an illegal arrest. While we review determinations of probable cause de novo, we will not
disturb the trial court's findings of fact unless they are against the manifest weight of the
evidence. Ornelas v. United States, 517 U.S. 690, 698-99, 134 L. Ed. 2d 911, 919-20, 116 S. Ct.
1657, 1662-63 (1996)); People v. Sorenson, 196 Ill. 2d 425, 431, 752 N.E.2d 1078 (2001); People v.
Centeno, 1-99-1378 (Ill. App. August 14, 2002), slip op. at 18-19. We will also give due weight to
the inferences the trial court has drawn from those facts. Ornelas, 517 U.S. at 698-99; Sorenson,
196 Ill. 2d at 431.
 Probable cause exists where, at the time of the arrest, the facts and circumstances known to
the police officer would lead a reasonable person to believe that the defendant had committed a
crime. People v. Williams, 275 Ill. App. 3d 249, 253, 655 N.E.2d 1071 (1995). An arrest effectuated
without either a warrant or probable cause violates an individual's constitutional right to be free
from unlawful searches and seizures. People v. Melock, 149 Ill. 2d 423, 436, 599 N.E.2d 941 (1992);
U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.
 The defendant contends that he was under arrest when he was taken from the Lewis home and
that, even if he was not under arrest at that moment, he was, in any event, under arrest long before
he made an incriminating statement. The State acknowledges that the officers did not have probable
cause to arrest the defendant at the time he was transported to the station. It asserts, however,
that the trial court properly found that the defendant was not arrested until 7 p.m. on October 16,
when he was formally placed under arrest. At that time, the State contends, the officers did have
probable cause to arrest the defendant as Johnson had given a statement naming him as a participant
in the victim's murder.
 A person has been arrested when his freedom of movement is restrained by physical force or a
show of authority. Melock, 149 Ill. 2d at 436. In determining whether an arrest has occurred, the
key inquiry is whether, under the circumstances, a reasonable innocent person would have concluded
that he was not free to leave. People v. Reynolds, 94 Ill. 2d 160, 164, 445 N.E.2d 766 (1983). In
determining whether an arrest has occurred, a court may consider the number of police officers
present, whether the officers displayed a weapon or touched the person, whether the officers used
language suggesting that the person was compelled to obey, and whether any of the practices that
normally accompany an arrest, such as searching, handcuffing, and fingerprinting, took place.
People v. Bolden, 197 Ill. 2d 166, 180, 756 N.E.2d 812 (2001).
 We first address the defendant's assertion that he was under arrest at the time the officers
transported him to the station. The testimony of Officers Keating, Glynn, and Jesionowski
established that: four officers went to the address on Artesian Avenue looking for Lewis because
detectives wished to speak with him; while the officers were there, they encountered the defendant;
the defendant stated that Lewis was not involved in the shooting, and, upon being asked to accompany
the officers to the station to discuss the matter, the defendant agreed; and the defendant was not
handcuffed. The trial court specifically found the officers' accounts of the events to be credible
and rejected Farrar's testimony that the police officers entered her home with helmets, shields, and
battering rams. The defendant does not challenge the trial court's credibility determinations or
factual findings. He contends, however, that, even based upon the facts as testified to by the
officers, he was under arrest when he was transported to the station. In support of this
contention, the defendant points to the facts that additional officers were called to the scene
after the officers discovered him, Porter, and Johnson in the basement, that he was not given the
option of going to the police station on his own, and that officers patted him down before
transporting him. It is true that the number of officers present is a factor to be considered when
determining whether an arrest occurred. See People v. Brown, 136 Ill. 2d 116, 124-25, 554 N.E.2d
216 (1990). However, Officers Glynn and Jesionowski testified that there were never more than six
officers on the scene, and there is no evidence that the additional officers called to the scene had
any interaction whatsoever with the defendant. Further, the officers' testimony, which the trial
court found to be credible, established that no force was used and that the defendant was not
handcuffed. We also cannot say that the fact that the officers patted down the defendant before he
got into their car or that they did not ask the defendant if he wished to provide his own
transportation to the station compel a finding that the defendant was under arrest. Rather,
considering the totality of the circumstances, and giving the requisite deference to the trial
court's credibility and factual findings, we conclude that the defendant was not under arrest when
he first accompanied the officers to the station.
 Our inquiry does not end there, though. Voluntary presence at the police station in order to
assist with an investigation may progress into unlawful detention with the passage of time. People
v. Booker, 209 Ill. App. 3d 384, 393, 568 N.E.2d 211 (1991). Illinois courts have repeatedly
rejected the proposition that a person who voluntarily accompanies the police to the station for
questioning "implicitly consents to remain in the police station while the police investigate the
crime to obtain probable cause for the interviewee's arrest." People v. Barlow, 273 Ill. App. 3d
943, 950, 654 N.E.2d 223 (1995). See People v. Wallace, 299 Ill. App. 3d 9, 701 N.E.2d 87
(1998)(defendant remained in an interview room with door closed until he made incriminating
statement; defendant was not free to move about station, not told he could leave, and was advised of
Miranda rights several times); Barlow, 273 Ill. App. 3d 943 (defendant left in locked interview room
for six hours while police conducted investigation); People v. Booker, 209 Ill. App. 3d 384, 568
N.E.2d 211 (1991)(defendant left in processing room with access to telephone while police conducted
interview, at various intervals was questioned and asked to submit to physical examination and
polygraph test); People v. Sturdivant, 99 Ill. App. 3d 370, 425 N.E.2d 1046 (1981)(rejecting
State's argument that the defendant freely chose to remain in police station for 9 hours). In the
instant case, approximately 19 hours elapsed between the defendant's arrival at the police station
and his formal arrest. We must consider the events which occurred during that 19-hour period in
order to determine whether the defendant's presence at the station remained voluntary.
 Upon arriving at the police station shortly after midnight on October 16, 1997, the defendant
was placed in an interview room together with Porter and Johnson. There was conflicting testimony
as to whether the interview room was locked. Jesionowski did not know if the door to the room was
locked and Lenihan believed that it was not. Ryan, on the other hand, believed the room was locked.
 The trial court made no finding of fact on the issue. At any rate, it is clear that the door to
the room was closed and that the men could not leave the room unaccompanied. The defendant contends
that the fact that he was placed in an interview room with the door closed and possibly locked
rather than in a public waiting area indicates that he was under arrest. See People v. Reynolds,
257 Ill. App. 3d 792, 801, 629 N.E.2d 559 (1994); People v. Young, 206 Ill. App. 3d 789, 799, 564
N.E.2d 1254 (1990). The State disagrees. It points to Ryan's testimony that the reason the door
was locked was that no one, including a witness, is allowed to walk around the police station
unaccompanied. The detective testified that the men were told to knock on the door if they needed
anything. Ryan also testified that, while the defendant was never expressly told that he could
leave, he was told that he was not under arrest. The State further asserts that the fact that the
defendant was placed in the interview room together with Johnson and Porter indicates he was not
under arrest. We agree with the trial court that this fact suggests the defendant was being treated
as a witness rather than a suspect. See People v. Walls, 220 Ill. App. 3d 564, 578, 581 N.E.2d 264
(1991)(court found it significant that defendant was accompanied to station for questioning by his
friend and that defendant was aware there were others present at station for questioning as well).
In our opinion, a reasonable innocent person, having voluntarily accompanied the officers to the
station and having been placed in a room with two friends and informed that he was not under arrest
and should knock on the door if he needed anything, would have believed he was free to go, even if
the door was locked.
 At the time the defendant and the others were brought to the station for questioning, Lenihan
and Ryan, the detectives in charge of the investigation, were not on duty. Accordingly, the men sat
in the interview room without being interviewed from shortly after midnight on October 16 to about
8:30 a.m. that same day, when the detectives arrived. The defendant was not interviewed at that
point. Rather, Lenihan briefly spoke to the defendant, introducing himself, stating that he had
other matters to attend to in connection with the investigation, and asking the defendant to be
patient. The defendant asked how long Lenihan's other matters would take, and the detective stated
that he did not know but would try to return as quickly as possible. According to Lenihan, the
defendant did not object. We note, however, that the defendant was not given the option of leaving
the station and returning at a later time. See Young, 206 Ill. App. 3d at 801-02 (finding that
State failed to provide adequate explanation of why defendant was not given option of going home and
returning at later time when officer would be available to interview him). When Lenihan and Ryan
returned to the station around 3 or 3:30 p.m., they finally began interviewing the men. The
detectives interviewed Porter first and then the defendant, advising the defendant of his Miranda
rights. The detectives testified that they advised the defendant of his rights just "to be safe" as
they did not know what the defendant would say. There is no evidence, however, that the defendant
was told he was being advised of his rights merely as a precautionary matter. While not in itself
dispositive of the question of whether an arrest has occurred, the giving of Miranda warnings is
commonly recognized as an indicia of arrest. Barlow, 273 Ill. App. 3d at 949. Further, we find it
very significant that, after interviewing the defendant, the detectives did not tell the defendant
that he was free to go even though, having questioned the defendant, "the police had ostensibly
accomplished their articulated purpose for bringing defendant to the police station" (Young, 206
Ill. App. 3d at 800-01). Rather, the detectives returned the defendant to the interview room with
Porter and Johnson. We find that, at that time, a reasonable innocent person, having been advised
of his Miranda rights, having stated that he knew nothing about the crime in question, and having
been returned to the interview room rather than released, would not have believed that he was free
to go. See Centeno, No. 1-99-1378, slip op. at 21-22; Young, 206 Ill. App. 3d at 800-01.
Accordingly, we conclude that the defendant was under arrest no later than the time at which he was
placed back into the interview room following his first interview, which, according to the testimony
of Detectives Lenihan and Ryan, was at approximately 4 p.m. on October 16. The State does not even
assert that the officers had probable cause to arrest the defendant anytime prior to his formal
arrest at 7 p.m. on October 16.
 Our finding that the defendant was subject to an illegal arrest does not, however, answer the
question of whether the handwritten statement which Klaczynski took from the defendant at 12:50 a.m.
on October 18 was admissible at his trial. Wallace, 299 Ill. App. 3d at 18. A confession obtained
following an illegal arrest may, nonetheless, be admissible if the confession was sufficiently an
act of the defendant's free will such that it is purged of the primary taint of the illegal arrest.
People v. White, 117 Ill. 2d 194, 222, 512 N.E.2d 677 (1987). In Brown v. Illinois, 422 U.S. 590,
603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975), the United States Supreme Court set
forth four factors to be considered in determining whether a confession obtained following an
illegal arrest was a product of that arrest or was purged of the initial taint. These factors are:
1) the temporal proximity between the arrest and the confession; 2) the presence of intervening
circumstances; 3) the purpose and flagrancy of the police misconduct; and 4) whether Miranda
warnings were given. Brown, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. The
State bears the burden of demonstrating, by clear and convincing evidence, sufficient attenuation of
evidence obtained through an illegal arrest. People v. Foskey, 136 Ill. 2d 66, 86, 554 N.E.2d 192
(1990); People v. Wright, 294 Ill. App. 3d 606, 612, 691 N.E.2d 94 (1998).
 In the instant case, the trial court, having concluded that the defendant was not the subject
of an illegal arrest, never considered the question of attenuation. The defendant contends that
there are not sufficient attenuating circumstances to purge his inculpatory statement of the taint
of his illegal arrest and that, accordingly, we should reverse his conviction, suppress his
statement, and remand for a new trial. The State asserts that, if we find that the defendant was
illegally arrested, we should remand the matter to the trial court in order for it to conduct an
attenuation hearing. In order to determine the appropriate course of action, we must consider
whether the record before is sufficiently complete to allow an independent determination on the
issue of attenuation.
 The first factor at issue is the temporal proximity of the defendant's illegal arrest to his
confession. As we have concluded, the defendant was under arrest no later than 4 p.m. on October
16, 1997, when the detectives, upon completing their first interview with the defendant, did not
tell the defendant he was free to go but returned him to the interview room with Porter and Johnson.
 Klaczynski took a handwritten statement from the defendant at 12:50 a.m. on October 18, 1997.
Therefore, the defendant was in custody for approximately 33 hours at the time he gave the
inculpatory statement at issue. Courts have noted that a significant lapse of time between an
illegal arrest and the making of a statement is an ambiguous factor which "may serve to amplify the
coercion latent in a custodial setting, particularly when there are other indicia of coercion" or,
on the contrary, "may help to purge the taint of a prior illegality by allowing an accused to
reflect on his situation, particularly when attended by other factors ameliorating coercion, such as
Miranda warnings." People v. Lekas, 155 Ill. App. 3d 391, 414, 508 N.E.2d 221 (1987); see also
White, 117 Ill. 2d at 223-24. There was no evidence introduced as to what occurred between 7 p.m.
on October 16, when the defendant was formally placed under arrest, and 11:45 p.m. on October 17,
when Klaczynski first interviewed the defendant. Accordingly, we are unable to determine whether
the 33-hour lapse of time here weighs in favor of or against a finding of attenuation.
 Another factor to consider in determining whether a statement given subsequently to an illegal
arrest is admissible is whether the defendant was advised of his rights prior to being questioned.
Although it is not enough, standing alone, to purge the taint of a defendant's illegal arrest, the
giving of Miranda warnings clearly weighs in favor of a finding of attenuation. People v. Jennings,
296 Ill. App. 3d 761, 764, 695 N.E.2d 1303 (1998). From the record, we know that the defendant was
advised of his Miranda rights when he was interviewed by Lenihan, Ryan, and Klaczynski. Again,
however, the record is silent as to what happened between 7 p.m. on October 16 and 11:45 p.m. on
October 17. Accordingly, we are unable to determine whether the defendant was interviewed without
the benefit of Miranda warnings during that time period.
 The flagrancy of police misconduct, or lack thereof, and the presence or absence of
intervening circumstances have emerged as the key factors in determining whether a statement
obtained subsequent to an illegal arrest is sufficiently purged of the taint of that arrest to be
admissible. Jennings, 296 Ill. App. 3d at 765. From the record before us we are able to determine
that the officers did not go out in search of the defendant and, in fact, had no reason to believe
the defendant was involved in the victim's murder at the time they asked him to accompany them to
the station. Although the defendant was placed in an interview room with the door closed, and
possibly locked, he was kept with his friends until such time as he had been named as a participant
in the victim's murder. We do not believe these circumstances evidence flagrant and purposeful
police misconduct. As with the previous two factors, though, without knowing what occurred at the
police station between the hours of 7 p.m. on October 16 and 11:45 p.m. on October 17, we are not
able to state definitively whether this factors weighs in favor of or against a finding of
attenuation.
 The final factor to be considered is whether there were any intervening circumstances which
served to purge the defendant's confession of the taint of his illegal arrest. See People v.
Turner, 259 Ill. App. 3d 979, 993, 631 N.E.2d 1236 (1994). The confrontation of a defendant with
new legally obtained information is one possible intervening circumstance which may produce a
voluntary desire to confess and, thereby, render the statement admissible. Jennings, 296 Ill. App.
3d at 766. At trial, Lenihan testified that, during the 7 p.m. interview on October 16, the
defendant was "confronted with certain facts". He did not, however, testify as to the nature of
these facts or the manner in which the
detectives learned of them. It is possible that the detectives confronted the defendant with the
fact that Johnson made a statement naming him as a participant in the murder. We cannot say. The
defendant contends that, even if he was informed of Johnson's statement, this cannot serve as an
intervening circumstance sufficient to attenuate his statement from the illegal arrest because
Johnson himself was illegally under arrest at the time he made his statement. In support of this
proposition, the defendant relies on People v. Austin, 293 Ill. App. 3d 784, 688 N.E.2d 740 (1997)
and People v. Beamon, 255 Ill. App. 3d 63, 627 N.E.2d 316 (1993), in each of which cases the court
held that the confrontation of an illegally arrested defendant with a statement made by a co-
defendant also under illegal arrest cannot serve as an intervening circumstance constituting
attenuation. We note that there is some question as to whether the holdings in Austin and Beamon
conflict with the holding of our supreme court in People v. James, 118 Ill. 2d 214, 226, 514 N.E.2d
998 (1987), that a defendant lacks standing to seek suppression of his confession on the ground that
it is the product of someone else's illegal arrest. See Austin, 293 Ill. App. 3d at 791-93 (Quinn,
J., specially concurring); People v. Ornelas, 295 Ill. App. 3d 1037, 1045 n. 1, 693 N.E.2d 1247
(1998). We need not decide the conflict at this time, however. Not only is the record before us
insufficient to allow a determination as to whether the defendant was ever confronted with Johnson's
statement, it is also insufficient to allow a determination as to whether Johnson was illegally
under arrest at the time he gave that statement. Further, as we have noted, the record is silent as
to what took place between the time of the defendant's formal arrest at 7 p.m. on October 16, 1997,
and 11:45 p.m. on October 17, when Klaczynski first interviewed the defendant. It is clear that we
do not have enough information to enable us determine whether intervening circumstances exist
sufficient to purge the defendant's statement of the taint of his illegal arrest.
 As the record before this court is not sufficient to allow us to make an independent
determination on the matter of attenuation, we find that the appropriate course of action is to
vacate the defendant's convictions and sentences and remand this cause to the trial court with
directions to conduct a hearing to determine whether the defendant's inculpatory statement was
sufficiently attenuated from his illegal arrest to render it admissible. See Wallace, 299 Ill. App.
3d at 9.
 Since the trial court may find that sufficient attenuating circumstances exist to render the
defendant's inculpatory statement admissible, we will discuss the defendant's remaining contentions
of error, none of which were raised in the defendant's motion for a new trial. As a general rule, a
defendant's failure to include an issue as the basis for relief in his post-trial motion results in
a waiver of the issue for purposes of appeal. See People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d
1124 (1988). The defendant asserts that we should, nonetheless, review the issues under the
doctrine of plain error or under the theory that his trial counsel provided ineffective assistance
in failing to preserve the issues for our review. Waiver aside, we will address the defendant's
contentions.
 [The following material is nonpublishable under Supreme Court Rule 23].

 [The preceding material is nonpublishable under Supreme Court Rule 23].
 The defendant argues that his first degree murder conviction should be vacated because it is
the product of impermissible double enhancement. Alternatively, the defendant argues that his
convictions for both home invasion and felony murder violated the double jeopardy clause of the
fifth amendment. As stated above, the defendant in this case was indicted for home invasion and
three types of first degree murder; namely, intentional murder, knowing murder, and felony murder,
as provided in subsections (a)(1) through (a)(3) of section 9-1 of the Criminal Code of 1961 (Code)
(720 ILCS 5/9-1(a)(1)-(3) (West 1996)). The jury was instructed as to each of these offenses and as
to the law regarding accountability. The jury rendered a verdict of guilty for home invasion and
first degree murder without designating the type of first degree murder upon which it based its
finding of guilt. At sentencing, the trial court found that it was most appropriate to enter
judgment on the felony murder count and ordered that the knowing and intentional murder counts be
merged into the felony murder count. Each of the defendant's arguments is premised upon the fact
that he was convicted of felony murder, rather than intentional or knowing murder. We agree with
the State, however, that the trial court erred in entering judgment on the felony murder count
rather than the intentional murder count. We will explain.
 It is well-settled that, where an indictment contains several counts arising out of a single
transaction and the jury returns a general verdict, the defendant is guilty as charged in each count
to which the proof is applicable. People v. Kidd, 178 Ill. 2d 92, 126, 687 N.E.2d 945 (1997).
Further, where multiple convictions are obtained for offenses arising out of a single act, sentence
is imposed on the most serious offense. People v. Cardona, 158 Ill. 2d 403, 411, 634 N.E.2d 720
(1994). As between the offenses of intentional, knowing, and felony murder, intentional murder is
deemed to be the most serious. Cardona, 158 Ill. 2d at 412.
 We find our supreme court's decision in People v. Cardona, 158 Ill. 2d 403, 634 N.E.2d 720
(1994) to be instructive here. In Cardona, the defendant was charged with intentional, knowing, and
felony murder and the jury returned a general verdict. The trial court entered judgment on all
three counts of murder but ordered that the judgments for intentional and knowing murder were merged
into the judgment for felony murder and imposed sentence for felony murder. Our supreme court,
concluding that the evidence was sufficient to support a verdict of guilt for intentional murder
upon the theory of accountability, held that the trial court erred in imposing sentence on felony
murder. Cardona, 158 Ill. 2d at 411-13. The court affirmed the defendant's conviction for
intentional murder and vacated his convictions for knowing and felony murder. Cardona, 158 Ill. 2d
at 414.
 We now consider whether the evidence in the instant case was sufficient to sustain a
conviction for intentional murder based upon the theory of accountability. A person is legally
accountable for the conduct of another when, before or during the commission of an offense and with
the intent to promote or facilitate the commission of said offense, he solicits, aids, or agrees or
attempts to aid the other person in the planning or commission of the offense. 720 ILCS 5/5-2 (West
1996). The evidence adduced at trial reveals that, on the morning of October 15, 1997, the
defendant and five other men traveled in two cars to the victim's home to carry out a pre-arranged
plan to kill the victim. The defendant drove one of the cars. When the group arrived at the
victim's address, the defendant sat in his car and acted as a lookout while three other men kicked
in the door. Thereafter, the defendant heard gunshots and saw the three men run from the building.
All six men then fled the scene. The evidence is sufficient to establish that the defendant was
legally responsible for the intentional murder of the victim.
 The defendant cites Griffin v. United States, 502 U.S. 46, 58, 116 L. Ed. 2d 371, 112 S. Ct.
466 (1991) and Stromberg v. California, 283 U.S. 359, 75 L. Ed. 2d 1117, 51 S. Ct. 532 (1931), for
the proposition that where, as here, a defendant is charged with multiple counts arising out of the
same act and a general verdict is returned, a conviction cannot be upheld if a conviction on any
one of the theories of guilt is legally impermissible. Arguing that he could not legally be
convicted of felony murder both because it constitutes an impermissible double enhancement and
because it violates principles of double jeopardy, the defendant contends that no murder conviction
can stand under any theory, including that of intentional murder. As there is no validity to the
defendant's assertion that he could not be convicted of felony murder, we disagree.
 "[D]ouble enhancement occurs when a factor previously used to enhance an offense or penalty is
again used to subject a defendant to a further enhanced offense or penalty." People v. Koppa, 184
Ill. 2d 159, 174, 703 N.E.2d 91 (1998). The defendant appears to argue that the act of murder
enhanced the misdemeanor offense of criminal trespass to residence to the felony of home invasion
and then also provided the basis for the felony murder conviction. In support of his argument, the
defendant cites People v. Johnson, 154 Ill. 2d 356, 609 N.E.2d 294 (1993), for the proposition that
"where a home invasion cannot be supported without relying on the acts which caused the victim's
death, a conviction of both murder and home invasion constitutes an illegal double enhancement."
The defendant misstates the holding in Johnson. In Johnson, as here, the defendant was convicted of
both home invasion and felony murder, based on the predicate felony of home invasion. The court,
noting that the home invasion charge was based on the defendant's conduct of entering the victim's
home and stabbing him, found that home invasion was necessarily a lesser included offense of murder
and vacated the home invasion charge. Johnson, 154 Ill. 2d at 371-72. We fail to see how Johnson
offers any support for the defendant's contention that his murder conviction should be vacated as a
result of double enhancement. In fact, we find no support at all for the defendant's contention in
this regard.
 The defendant also contends that his murder conviction should be vacated because his
conviction for both that offense and home invasion violates double jeopardy principles. The fifth
amendment states that no person shall "be subject for the same offence to be twice put in jeopardy
of life or limb." U.S. Const., amend. V. The test for determining whether a person has been
punished more than once for the same offense in violation of the double jeopardy clause is found in
Blockburger v. United States, 284 U.S. 299, 304, 76 L. Ed. 306, 309, 52 S.Ct. 180, 182 (1932), in
which the Court held: "The applicable rule is that, where the same act or transaction constitutes a
violation of two distinct statutory provisions, the test to be applied to determine whether there
are two offenses or only one is whether each provision requires proof of an additional fact which
the other does not."
 In support of his contention that his murder conviction violates the prohibition against
double jeopardy, the defendant relies upon People v. Gilyard, 251 Ill. App. 3d 117, 621 N.E.2d 625
(1993). In Gilyard, as here, the defendant was convicted of home invasion and felony murder, based
on the underlying felony of home invasion. Relying on Johnson, cited above, the court concluded
that, under the circumstances, home invasion constituted a lesser included offense of felony murder
and vacated the defendant's conviction for home invasion. Again, we fail to see how this supports
the defendant's assertion that his murder conviction cannot stand. At most, Johnson and Gilyard
stand for the proposition that the defendant here cannot be convicted of both felony murder and home
invasion but offer no support for the proposition that the defendant cannot be convicted of felony
murder.
 We have already determined that the evidence at trial was sufficient to sustain a conviction
for intentional murder under the theory of accountability. As such, under the principles set forth
in Cardona, we find that the trial court erred in entering judgment on the felony murder count
rather than the intentional murder count. The defendant's contentions that his first degree murder
conviction cannot stand, all of which are based on the premise that he was convicted of felony
murder rather than intentional murder, lack merit.
 For reasons which will become obvious, before turning to the defendant's contention that his
50-year sentence for first degree murder is excessive, we will first address the State's assertion
that the trial court erred in ordering the defendant's sentences to run concurrently rather than
consecutively. In People v. Arna, 168 Ill. 2d 107, 113, 658 N.E.2d 445 (1995), our supreme court
held that, when consecutive sentences are mandatory, a sentencing order imposing concurrent prison
terms is void and that a reviewing court has the authority to correct the void sentencing order at
any time despite the fact that the State does not have the right to appeal sentencing orders.
Accordingly, we will consider whether the trial court was required to impose consecutive sentences
as the State argues.
 At the time the offenses in the instant case were committed, section 5-8-4 of the Unified Code
of Corrections required that the trial court impose consecutive sentences where "one of the offenses
for which the defendant was convicted was a Class X or Class 1 felony and the defendant inflicted
severe bodily injury". 730 ILCS 5/5-8-4(a), (b) (West 1996 and Supp. 1997). This was so whether or
not the offenses were committed as part of a single course of conduct during which there was no
change in the nature of the criminal objective. 730 ILCS 5/5-8-4(a), (b) (West 1996 and Supp.
1997). Our supreme court has mandated that, in order to render the mandatory consecutive sentencing
provision at issue applicable, the severe bodily injury must have been inflicted during the
commission of the triggering Class X or Class 1 felony. People v. Whitney, 188 Ill. 2d 91, 98-99,
720 N.E.2d 225 (1999).
 Although murder is not itself a triggering offense under the applicable version of section 5-8-
4(a) of the Code[3] (Whitney, 188 Ill. 2d at 100), the victim's death may nonetheless serve as the
requisite severe bodily injury where it was inflicted during the commission of the triggering Class
X or Class 1 felony. People v. Thompson, No. 1-99-4230 (Ill. App. June 12, 2002); People v. Sample,
326 Ill. App 3d 914, 761 N.E.2d 1199 (2001); People v. Carney, 327 Ill. App. 3d 998, 1001-02, 765
N.E.2d 1028 (2002).
 The defendant in the instant case was convicted of first degree murder and home invasion,
which is a Class X felony (720 ILCS 5/12-11(c) (West 1996)). He argues that the severe bodily
injury to the victim arose not out of the home invasion, which would be a triggering offense under
section 5–8-4(a) and (b), but out of the first degree murder, which is not a triggering offense. We
disagree.
 In People v. Sample, 326 Ill. App 3d 914, 761 N.E.2d 1199 (2001), the defendant was convicted
of first degree murder, armed robbery, and home invasion. In rejecting the defendant's assertion
that the imposition of consecutive sentences was improper because the severe bodily injury to the
victim arose out of the first degree murder, a non-triggering offense, rather than the armed robbery
or home invasion, both triggering offenses, the court stated:
 "Defendant admitted that at the outset and throughout the crime, his intent was to rob the
 victim of drugs. Within the course of a few minutes, defendant, and those for whose actions he
 was held criminally responsible, entered [the victim]'s home by force, threatened him with a
 weapon, shot him, and stole his drugs. To parse out the crimes into bounded acts would
 contradict the reality that these crimes were intertwined both temporally and functionally."
Sample, 326 Ill. App. 3d at 928. See also People v. Thompson, No. 1-99-4230 (Ill. App. June 12,
2002)(holding that consecutive sentences were proper where victim killed during commission of an
armed robbery); Carney, 327 Ill. App. 3d at 1001-02 (same).
 In the instant case, the defendant and five other men went to the victim's address to carry
out a pre-arranged plan to kill him. When the men arrived, the defendant and two others stayed
outside to act as lookouts while the remaining three men forced their way into the victim's
apartment and killed him. The use of force is an element of the type of home invasion with which the
defendant was charged. 720 ILCS 5/12-11(a)(1)(West 1996). We conclude that the death of the victim
in this case occurred during the commission of the home invasion, a Class X felony.
 Citing People v. Miller, 193 Ill. App. 3d 918, 930-32, 552 N.E.2d 988 (1989) and People v.
Phelps, 329 Ill. App. 3d 1, 768 N.E.2d 168 (2002), appeal pending No. 93830, the defendant contends
that to impose a consecutive sentence based on the infliction of severe bodily injury, which is
inherent in the offense of first degree murder, would constitute an impermissible double
enhancement. The courts in Miller and Phelps held that consecutive sentences could not be ordered
under section 5-8-4 based on the infliction of severe bodily injury where severe bodily injury was
inherent in the triggering offense. Miller, 193 Ill. App. 3d at 930-32; Phelps, 329 Ill. App. 3d at
7-11. We first note that the divisions of the First District of this court are divided as to
whether the holding in Miller remains good law following our supreme court's decisions in Whitney,
People v. Wagener, 196 Ill. 2d 269, 752 N.E.2d 430 (2001), and People v. Carney, 196 Ill. 2d 518,
752 N.E.2d 1137 (2001). See Sample, 326 Ill. App. 3d at 930-31 (1st District, 2d Division);
Thompson, 1-99-4230, slip op. (1st District, 3d Division); and Carney, 327 Ill. App. 3d at 1003 (1st
District, 4th Division)(all concluding that double enhancement concerns are not implicated) and
Phelps, 329 Ill. App. 3d at 7-11 (1st District, 1st Division)(holding that double enhancement
concerns are implicated under some circumstances). We need not, however, settle this dispute as
the instant case is factually distinguishable from both Miller and Phelps. As stated, in both
Miller and Phelps, severe bodily injury was inherent in the triggering offense. The court in Phelps
explicitly stated that no similar prohibition would exist where the triggering offense did not have
severe bodily injury as an element, specifically identifying home invasion as such an offense.
Phelps, 329 Ill. App. 3d at 11; see also Thompson, 1-99-4230, slip op.; Sample, 326 Ill. App. 3d at
931; Carney, 327 Ill. App. 3d at 1003-04. The defendant here was convicted of home invasion, a Class
X felony which does not have severe bodily injury as an element. See 720 ILCS 5/12-11(a)(i)(West
1996). Accordingly, we find no merit to the defendant's argument that consecutive sentences cannot
be imposed.
 Because the defendant was convicted of a Class X felony during the commission of which severe
bodily injury was inflicted, we conclude that the trial court erred in ordering the defendant's
sentences for first degree murder and home invasion to run concurrently rather than consecutively.
 As a final matter, we note that the defendant contends, and the State concedes, that he is
entitled to two more days of credit for time served than the trial court awarded him.
 For the foregoing reasons, we vacate the defendant's convictions and sentences for first
degree murder and home invasion and remand the cause to the circuit court with directions that it
conduct an attenuation hearing. If the circuit court finds that the defendant's confession is
sufficiently attenuated from his illegal arrest to render it admissible, the court is directed to
enter a judgment of conviction for the offense of first degree murder pursuant to section 9-1(a)(1)
of the Code (intentional murder) (720 ILCS 5/9-1(a)(1) (West 1996)) and a conviction for home
invasion pursuant to section 12-11(a)(1) of the Code (720 ILCS 5/12-11(a)(1) (West 1996)), to
conduct a new sentencing hearing to determine the appropriate sentences to be imposed consecutively
(see People v. Arna, 263 Ill. App. 3d 578, 589, 635 N.E.2d 815 (1994), affirmed by Arna, 168 Ill. 2d
107), and to award the defendant the appropriate amount of credit for time served. If, on the other
hand, the trial court finds that no such attenuation exists to purge the defendant's confession from
the taint of his illegal arrest, we direct it to suppress the confession and conduct further
proceedings not inconsistent with this opinion. In doing so, we note that we have reviewed all of
the evidence presented at trial, including the defendant's confession, and find that it was
sufficient to support the defendant's convictions for first degree murder and home invasion beyond a
reasonable doubt such that a retrial would not be barred due to the constitutional prohibition
against double jeopardy. People v. Olivera, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995). Our
disposition has rendered it unnecessary that we address the defendant's contention that his sentence
for first degree murder is excessive.
 Judgment vacated and cause remanded with directions.
 HARTMAN and THEIS, JJ., concur.
-----------------------

 [1] Pursuant to a supervisory order issued by the Illinois Supreme Court on May 30, 2002,
(People v. Ollie, 199 Ill. 2d 572, 772 N.E.2d 742 (2002), this court vacated its initial decision in
the instant case, entered on February 7, 2002 (People v. Ollie, No. 1-00-1311 (2002) (unpublished
order under Supreme Court Rule 23)). The following opinion represents our resolution of all issues
on appeal.

 [2] In order to comply with the appellate court opinion page limitations as mandated by our
supreme court, the discussion of issues two, three, and four has been designated as nonpublishable
material. A full, unabridged text of this decision is on file with the clerk of this court under
docket number 1-00-1311.

 [3] Pursuant to an amendment which became effective January 1, 2000, section 5-8-4 of the
Code, now includes first degree murder as a triggering offense under subsections (a) and (b). 730
ILCS 5/5-8-4(a), (b) (West 2000). Citing the current version of section 5-8-4, the State argues that
consecutive sentences are mandated by virtue of the defendant's first degree murder conviction. To
impose consecutive sentences on the defendant pursuant to this post-offense amendment, though, would
constitute a violation of the constitutional prohibition against ex post facto laws. People v.
McCleary, 278 Ill. App. 3d 498, 500, 663 N.E.2d 22 (1996).